UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Amy Nelson,<br>   Plaintiff<br>v.<br><br>Town of Westminster, and<br>Chief Ralph LeBlanc in his individual and<br>official capacities<br>   Defendants | )<br>)<br>)<br>)<br>) Case No. 4:23-cv-40069-MRG<br>)<br>)<br>)<br>) |

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION TO DEFENDANT RALPH LEBLANC'S MOTION TO DISMISS

## INTRODUCTION

The Plaintiff, Amy Nelson ("Plaintiff") brings this action for damages against her employer, Town of Westminster and Chief Ralph LeBlanc for violations of Plaintiff's rights under the Family and Medical Leave Act and for discrimination on the basis of gender/sex. The Plaintiff also seeks damages for civil rights violation pursuant the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11I and H. Plaintiff further seeks redress for intentional interference with an advantageous relationship.

## FACTS

The Plaintiff became a full-time police officer with the Westminster Police Department in 2005 through the present day. Complaint at ¶1. Plaintiff is currently assigned to the position of Administrative Sergeant in the absence of a Lieutenant. Id at ¶2. In January 2005, the Plaintiff was hired as the Westminster police department's first Full-time female officer. Id at ¶6.

In 2018, the Plaintiff was notified that the Westminster Police Department would be adding an additional part-time School Resource Officer (SRO). Id at ¶28. The Plaintiff later learned that Defendant Leblanc stated that the Plaintiff was not considered for the position of SRO because she "was pregnant" and would be going out on maternity leave later that year. Id at ¶32. In the Fall of 2020, Chief McDonald retired, and Defendant Ralph Leblanc was appointed Acting Chief. Id at ¶49. During various times since his appointment to the position of Chief of Police, Defendant LeBlanc made repeated discriminatory remarks to and about the Plaintiff regarding her pregnancy which created a hostile and uncomfortable work environment for Plaintiff. Id at ¶50.

In December of 2020, after Defendant LeBlanc became Chief of Police, Plaintiff disclosed to him that she was pregnant and would need a "reasonable accommodation" for her pregnancy commencing near her due date in May of 2021. Id at ¶51. Plaintiff did not disclose that she was pregnant with twins at that time because she was concerned with Chief LeBlanc's previous openly negative statements and views regarding female officers having children and family responsibilities. Id at ¶52. Following her disclosure to Defendant LeBlanc, the Plaintiff was subsequently assigned to dispatch for her pregnancy and assigned to an 11 pm-7 am shift at that point. Id at ¶53. The Plaintiff had preferred to be assigned to an earlier 3 pm to 11pm shift. Id at ¶54. In February 2021, after Officer Michael Ray was injured in a cruiser accident, Plaintiff requested to be moved to the open 3pm-11pm dispatch shift. Id at ¶55. Chief Leblanc refused to do so and told the Plaintiff that she would not be allowed to move to the 3pm-11pm shift and needed to remain on the 11pm-7am shift until she went out on leave. Id at ¶56. Officer Ray was subsequently placed on the open 3pm -11pm dispatch shift despite the fact Plaintiff was pregnant and senior to Officer Ray, who had been with the Department for approximately one year. Id at

¶57. The late (midnight) shift 11pm-7am is considered a more physically difficult and burdensome tour of duty for the vast majority of law enforcement officers. Id at ¶59. During the Spring of 2021, Defendant LeBlanc told the Plaintiff in reference to another female officer "What business does she have, popping more kids out if she can't handle her schedule with the ones she has." The Plaintiff was also pregnant at the time Defendant LeBlanc made this comment to her. Id at ¶63. When the Plaintiff reacted negatively and expressed her displeasure with Defendant LeBlanc's comment, he turned and walked away. Id at ¶64.

On May 6, 2021, the Plaintiff was placed on FMLA early due to complications with her pregnancy. Id at ¶65. When Plaintiff notified Defendant LeBlanc of her medical complication, he did not return her phone call regarding her pregnancy issue or about her FMLA request. Id at ¶66. In September of 2021, the Plaintiff returned to work after her FMLA leave and was instructed shortly afterwards to remove her locker from the women's locker room and to place it in the Lt.'s office to make room for the younger female officers. Id at ¶67. Defendant LeBlanc knew that only male supervisors occupied the Lieutenant's office, and that the Plaintiff would be required to bring her uniform and toiletry items into the female locker room to change. Id at ¶68. Plaintiff refused to move her locker into this area and was informed that Defendant LeBlanc repeatedly complained about her failure to move her locker to the other location. Id at ¶69.

In Fall of 2021, Defendant LeBlanc began referring to the younger female officers in the Department as "His Ladies." Id at ¶70. The Plaintiff, as well as other male officers and Westminster firefighters, made verbal complaints that Defendant LeBlanc was unprofessional and "creepy" with how he referred to female officers. Id at ¶71.

On November 18, 2021, the Plaintiff notified the Chief that her daughter Alaina had cancer and was seriously ill. Id at ¶72. The Plaintiff explained that she would need to be out of

work for approximately 4-6 weeks while her daughter was hospitalized for her initial treatment, classification, and cancer grading. Id at ¶73. In November of 2021, the Plaintiff requested additional FMLA time through the Town of Westminster due to the significance of her daughter's illness. Id at ¶74. Plaintiff received an email from Sonjia Fitchel in Human Resources. Ms. Fitchel inaccurately reported the Defendant Town had met their obligation to her for FMLA leave during her pregnancy earlier in 2021 and would not grant Plaintiff additional FMLA time. Id at ¶75.

In late November 2021, the Plaintiff had a phone conversation with Defendant LeBlanc and asked what would happen if she used and exhausted her benefit time. Id at ¶76. The Plaintiff explained to Defendant LeBlanc that she did not have enough Vacation, Holiday, and Sick time to cover the 4-6 weeks of the necessary treatment of her daughter. Id at ¶77. Defendant LeBlanc brusquely told Plaintiff that if she ran out of time, she would have to separate her service from the Department, and when they posted her job, she could reapply and could "possibly" be hired back. Id at ¶78. On December 10, 2021, the Plaintiff was moved off group rotation by Defendant LeBlanc with no prior notification. When she asked the Defendant about being moved from her group, the Defendant repeatedly told the Plaintiff, "The world does not revolve around you, Amy." Id at ¶79. The Plaintiff told Chief Leblanc that the senior male Sergeants could previously pick their group. The Chief responded by stating, "You don't just get whatever you want." The Plaintiff told Chief Leblanc, "All year I had been scheduled to have Christmas off, and now 15 days before Christmas, I'm notified I won't have Christmas off despite my seniority?" Id at ¶80. Defendant Leblanc told Plaintiff that she would have to use her benefit time. The Plaintiff attempted to explain to Chief Leblanc that he had told her she would lose her job if she ran out of her benefit time and that she could not afford to use more of it. Id at ¶81.

The Plaintiff was extremely concerned about losing her job at this point and attempted to explain to Defendant LeBlanc that her daughter was expected to have intensive chemotherapy both on an in and out-patient basis for the next nine months and would have numerous treatment days and doctor's appointments during this time. Id at ¶82.

During the week of December 11, 2021, Plaintiff notified Chief Leblanc that she would not be out for the entire 4-6 weeks as previously anticipated because her daughter was recovering from her chemotherapy treatment quicker than expected. Id at ¶83. Defendant LeBlanc told Plaintiff that she should have given him more advanced notice of her daughter's recovery and anticipated release from the hospital. Id at ¶84. LeBlanc stated to the Plaintiff that "the rumor mill told him that she would be back in mid-January," and that her "returning early would cause a problem with the schedule." Id at ¶85. On December 17, 2021, the Plaintiff returned to work and canceled her use of vacation due to low benefit hours. Id at ¶86.

During November and December 2021, members of the Westminster Police Department began to donate their personal time to the Plaintiff to help allow her time off to take care of her daughter and attend medical appointments. Id at ¶87. Defendant LeBlanc intentionally never provided Plaintiff with an accumulation of the time donated by her fellow officers. Id at ¶88. Defendant Leblanc told his administrative assistant, that he was not going to tell Plaintiff about the donated time by fellow officers because LeBlanc felt Plaintiff was "selfish" for having a GoFundMe me account in her daughter's name that a Grafton Police supervisor organized. Id at ¶89. This GoFundMe account was not created by the Plaintiff or her family members. It was set up by a Grafton police supervisor who wanted to help with the expected hospital and medical expenses associated with Plaintiff's daughter's medical care and treatment. Id at ¶90.

In late December of 2021, Defendant Leblanc advised the Union that Plaintiff was not allowed to bid on her group rotation in the future. Id at ¶91.

On January 11, 2022, Defendant LeBlanc requested firearms and training information from both Sgt Auffrey and the Plaintiff. Id at ¶92. On January 18, 2022, the Plaintiff responded to LeBlanc's request for status explaining that they had required significant time to research and complete. Id at ¶93.  On January 19, 2022, Defendant LeBlanc told Plaintiff the tasks he (LeBlanc) had requested were simple, and that he would be reassigning her responsibilities to the Lieutenant. No action was taken against Sgt. Auffrey who had been tasked with the same information gathering. Id at ¶94.

On May 10, 2022, the Plaintiff's request for intermittent FMLA leave was filed for the Plaintiff's daughter's ongoing leukemia treatment. Defendant Leblanc had been provided with a 30-day notice of the request and the Town's Human Resource Department was also notified and had approved the request. Id at ¶95. During the same week, the Plaintiff spoke to Defendant Leblanc regarding her daughter's cancer treatment that had been delayed because her daughter's required blood counts to administer the medication had not been met. Id at ¶96. Defendant Leblanc was advised that the Plaintiff would need at least one additional day off for her daughter's treatment, but it could end up being more than one day if complications arose. Id at ¶97. Defendant LeBlanc made a negative comment to Plaintiff in response, implying that she could be once again, faced with the possibility of losing her employment with the Town in the event  she exhausted both her FMLA and benefit time. Id at ¶98.

On May 15, 2022, the Plaintiff emailed Defendant Leblanc regarding the effects of the Department's recently proposed forced overtime policy on officers who held specialty positions and those having families. Id at ¶99.  On June 7, 2022, Chief Leblanc spoke to the Plaintiff about

the changes to be made to the proposed forced overtime policy. The Plaintiff spoke to Defendant Leblanc about the possibility of a forced overtime occurring on a day she had to take off under FMLA for her daughter's treatment. Id at ¶100.  Defendant Leblanc stated that the Plaintiff would be required to provide extra documentation from a doctor if Plaintiff were to miss a forced overtime due to her use of FMLA for the treatment of her daughter. Id at ¶101.  Defendant LeBlanc stated that the Plaintiff would be required to get a "doctor's note" in the event of such an occurrence while using FMLA. Id at ¶102. Defendant LeBlanc attempted to justify the need for requiring a doctor's note for Plaintiff's use of FMLA by stating, "… so that when people "Bitch about [her]," he has a doctor's note to show them. Id at ¶103.

On June 10, 2022, Defendant LeBlanc contacted the Plaintiff, who was in the infusion room with her daughter while receiving treatment. LeBlanc confronted Plaintiff about Selectmen Albert "snooping around" regarding the Chief and making allegations about low morale and people being treated poorly. Id at ¶104. On or about June 23, 2022, the Plaintiff spoke to Defendant LeBlanc regarding the forced overtime policy needing to be changed to reflect their conversation. Defendant LeBlanc told the Plaintiff that she "should have made better choices" (regarding her pregnancies) when she chose to take on her current responsibilities. Chief Leblanc stated the forced overtime policy would not be changed, and that the Plaintiff would have to deal with it. Id at ¶105.

On June 28, 2022, the Plaintiff's firearms duties as well as other responsibilities were taken away from the Plaintiff without conversation or agreement. This action occurred only after Plaintiff had disagreed with Chief Leblanc about the changes in the forced overtime policy and how forced overtime was problematic for her based on her daughter's ongoing care needs and authorized use of FMLA. Id at ¶106.

On July 18, 2022, the Plaintiff emailed Town Administrator Stephanie Lahtinen and asked if she could meet with her. The Plaintiff specifically picked this week because Chief Leblanc was on vacation. There are cameras at the Town Hall, which the police department monitors. Ms. Lahtinen agreed to meet with the Plaintiff on Wednesday, July 20, 2022, at 2 pm. Id at ¶107. On July 20, 2022, the Plaintiff spoke to Ms. Lahtinen regarding Chief Leblanc's behavior toward her, including how Defendant LeBlanc had treated Plaintiff during her pregnancy and use of FMLA leave. Id at ¶108.

On August 14, 2022, the Plaintiff once again spoke to Ms. Lahtinen at the Neighbors Helping Neighbors benefit. On August 19, 2022, Ms. Lahtinen subsequently interviewed Ms. Fay about Chief Leblanc's behaviors. Id at ¶109. Attorney Regina Ryan was subsequently hired by the Defendant Town of Westminster to conduct an investigation into the allegations of discrimination and retaliation made by the Plaintiff and others. Id at ¶110. On August 22, 2022, Chief Leblanc was placed on Administrative Leave pending Attorney Ryan's investigation. Id at ¶111. In September of 2023, Attorney Ryan interviewed the Plaintiff on two separate occasions regarding the discrimination and retaliation she had experienced. Id at ¶112. Attorney Ryan's conclusions regarding the Plaintiff's allegations are italicized below:

> "In short, I find that Chief LeBlanc made discriminatory remarks about pregnancy, and this has created an uncomfortable work environment for Sgt. Nelson and Ms. Fay. Further, I find that Chief LeBlanc retaliated against Sgt. Nelson for utilizing pregnancy leave and/or FMLA." "With respect to pregnancy, which is expressly included as a protected class in the Town's policies, Chief LeBlanc has made offensive comments. Sgt. Nelson and Ms. Fay complain that Chief LeBlanc remarked that former officer Holly Doyle should stop "popping out kids" because she could not manage the children she has." "I also credit Ms. Fay's statement that Chief LeBlanc said, "I don't know how [Sgt. Nelson] is going to be a sergeant and have all these kids," and two kids is all you can manage." "I do not credit Chief LeBlanc's denials of these claims. First, as mentioned, some statements are corroborated by other witnesses. Second, Chief LeBlanc's denials are not absolute. He acknowledges that he noted his preference for two children to Sgt. Nelson and that he might have asked Ms. Fay not to get pregnant. He explains that "if" he ever said this to Ms. Fay, he was joking. However, these explanations are not definitive."

"These comments were enough to interfere with the work environment unreasonably. Sgt. Nelson noted that Chief LeBlanc's views about pregnancy made her afraid to tell him that she was expecting twins. Ms. Fay confirms Sgt. Nelson's apprehensions, and she too feared Chief LeBlanc's reaction. Given what Chief LeBlanc has said in the past about having more than two children, I find that the hostility felt by both Sgt. Nelson and Ms. Fay about becoming pregnant was objectively reasonable." "Further, Sgt. Nelson contends that certain actions taken by Chief LeBlanc constitute discrimination and/or retaliation for taking pregnancy and/or FLMA leave. They include: (1) his decision to promote then Sgt. Tamulen to lieutenant and change the promotion policy; (2) changes made to the work schedule; (3) changes made to the force policy; (4) failure to inform her of vacation time that other officers volunteered; (5) his "request" that she relocate her locker; (6) his "insistence" that she provide a doctor's note when being forced onto a shift while on FLMA; and (7) that her firearms duty was "taken" from her. However, I do not sustain all of these complaints." "At the outset, I find that some, but not all, of the incidents identified by Sgt. Nelson demonstrate a pattern of retaliation taken by Chief LeBlanc against Sgt. Nelson. I will address each of these incidents separately." "With respect to the changed work schedule, Sgt. Nelson took offense that she, as senior sergeant, was not allowed to select the group rotation (which dictated the holidays she would be off). There is no dispute that in December 2021, while Sgt. Nelson was absent from work to care for her sick child, Chief LeBlanc permitted Sgt. Nelson to select her preferred shift for when she returned to work. Sgt. Nelson assumed he did not ask for her preferred group rotation because he was not planning to change group rotations. However, days later, Sgt. Nelson learned that Chief LeBlanc did not ask for her preference because he changed the longstanding practice of allowing the senior officer to pick the group rotation. Of great concern to Sgt. Nelson was that this change caused Sgt. Nelson to lose her scheduled days off for Christmas and Christmas Eve. Chief LeBlanc's claim that he was not aware that the change to the group rotation stripped Sgt. Nelson of having the Christmas holidays off, and his insistence that this change is necessary because there are now three sergeants, is not credible. In fact, both the timing of the change in practice, days after she requested time off to care for her sick daughter, and the direct impact it had on her holiday schedule, cannot be understated." "Next, I find Sgt. Nelson credible that Chief LeBlanc requested she move her belongings out of the women's locker room and use the sergeant's office that she shared with two male sergeants as a locker room. I also credit Sgt. Nelson that this request upset her, and she felt that it was unfair because she was the senior officer, and consistent with the department's past practice, she was entitled to the larger locker. Chief LeBlanc does not deny that he proposed the idea to Sgt. Nelson. He did not ask any of the other sergeants to use the sergeant's office as their locker room. I credit Sgt. Nelson that when Chief LeBlanc asked her to move her belongings out of the locker room, she was upset and felt singled out knowing no other senior officer had ever been asked to do this in the past." "Next, I credit Sgt. Nelson that Chief LeBlanc told her she would need a doctor's note when she used FMLA when being "forced" to work overtime. Further, I find that although Sgt. Nelson never produced a medical note, Chief LeBlanc told her that she would need to have a note in case someone "bitches" about it to him. I credit Sgt. Nelson that Chief LeBlanc's request for a medical note for a single absence was unique to her. Ms. Fay and Sgt. Auffrey corroborate this request by Chief LeBlanc. The Town's policy

provides: "When an employee requests FMLA leave due to his or her own serious health condition or a covered family member's serious health condition, the Town shall require certification in support of the leave from a health care provider." Sgt. Nelson's FMLA was approved, yet by requiring additional medical documentation on forced shifts, Sgt. Nelson believed she was being held to a different standard from her colleagues." "Next, I find that Chief LeBlanc intentionally failed to inform Sgt. Nelson of the amount of vacation time donated by her peers after she shared with him that she was out of FLMA time and running out of sick/vacation days to care for her sick daughter. Although in December 2021, the Town notified Sgt. Nelson that 64 hours of time donated by Chief LeBlanc and Lt. Tamulen was available to use effective immediately. Chief LeBlanc knew other officers offered vacation time and he intentionally withheld this information from Sgt. Nelson. Chief LeBlanc's explanation that he was taking a limited role in administering the donated vacation hours (so that employees and the Union did not think he was forcing the issue) and that "Personnel" was the approving authority is not credible. I credit Ms. Fay, who reports that when she kept Chief LeBlanc informed of the donated time off from employees, he responded that Sgt. Nelson was taking advantage of the situation and was being selfish because she also received money from a GoFundMe account. Ms. Fay produced multiple emails showing that officers were donating time, and Chief LeBlanc is included on the emails." "Next, I find that Chief LeBlanc responded to Sgt. Nelson that if she ran out of time off, she would be terminated and would have to resign from the WPD. I also credit Sgt. Nelson that she later learned from Ms. Lahtinen that the Town had no intention of terminating Sgt. Nelson and they wanted to assist her in any way as she dealt with her tragic situation." "Chief LeBlanc's decision to promote Lt. Tamulen in March 2021, while Sgt. Nelson was pregnant, is also problematic. Chief LeBlanc gave no reason for not calling a new list of candidates for the lieutenant position but understood that Sgt. Nelson would have been a candidate for lieutenant had he called a new list. He claimed that Sgt. Tamulen was the only candidate on the list, and he was thus promoted. Chief LeBlanc, however, called a new list for the sergeants, opening up the position to new officers." "These aforementioned actions taken by Chief LeBlanc establish a pattern of unfair treatment of Sgt. Nelson. I find that Chief LeBlanc retaliated against Sgt. Nelson for taking pregnancy and/or FMLA time. I find Sgt. Nelson credible that this treatment by Chief LeBlanc impacted her ability to do her job and made her feel uncomfortable in the workplace." "Regarding Chief LeBlanc's change to the Candidate Ranking provision of the Promotions Policy from largely objective criteria (i.e., 30% written exam score, 10% seniority, etc.) to entirely subjective criteria (compare Exhibits 13 and 14), Sgt. Nelson alleges that these changes were directed at her and reduced her chances of being promoted. Additionally, Sgt. Nelson had recently acquired her master's degree, which had previously contributed to the promotion policy. Chief LeBlanc noted that he could not recall the changes to the policy, even in a general way; however, this explanation does not ring true. One would expect someone in Chief LeBlanc's role to have some recollection of significant changes he made to the department's Promotions Policy fifteen months earlier. The new policy considers educational achievements but is no longer weighted at 20% of a candidate's total score. Further, the most significant change is the elimination of the written exam, which formerly accounted for 30% of a candidate's total score and gives Chief LeBlanc more discretion in the hiring process. However, whether the policy change was directed against Sgt. Nelson cannot be

sustained at this point." "Based on the above, I find that Chief LeBlanc violated the Town's EEO and NonDiscrimination Statement, Workplace Harassment Policy, Code of Conduct Policy, Sexual Harassment Policy and WPD Rule 4.02 by exhibiting conduct unbecoming an officer, Rule 7.2 by making disparaging comments about colleagues, and Rule 7.3 by acting discourteous or inconsiderate to colleagues." Id at ¶113.

## STANDARD OF REVIEW

It is not proper to dismiss a complaint under Fed. R. Civ. P. 12(b)(6) unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984). When deciding a motion to dismiss, the Court must accept as true all well-pleaded factual claims and indulge all reasonable inferences in the plaintiff's favor. *Doyle v. Hasbro, Inc.* 103 F.3rd 186, 190 (1st Cir. 1996). The proper standard for assessing the adequacy of the complaint is whether, accepting the factual allegations as true and construing these facts in the light most favorable to the plaintiff, the pleading shows any facts, which could entitle the plaintiff to relief. *Gooley v. Mobil Oil Corp*, 851 F.2d 513, 514 (1st Cir. 1988). A Court must "affirm a dismissal for failure to state a claim only if it clearly appears that, on the facts alleged, the plaintiff cannot recover on any viable theory." *Wagner v. Devine*, 122F.3rd 53, 55 (1st Cir. 1997).

## ARGUMENT

### 1. The Plaintiff Has Sufficiently Plead Her Claim of Intentional Interference with Advantageous Relations.

The elements of the tort are uncontroversial: to prevail on a tortious interference claim, a plaintiff must demonstrate (1) that she had a business relationship, (2) that the defendant knew of this relationship, (3) that the defendant intentionally and maliciously interfered with the relationship, and (4) that the defendant's actions harmed her. *Comey v. Hill,* 387 Mass. 11, 438 N.E.2d 811, 816 (1982).

Tortious interference takes an intriguing turn in the employment context. Common sense suggests that an employee may not sue her employer for interfering with its own contract, and the case law verifies this intuition. *Harrison v. Netcentric Corp.,* 433 Mass. 465, 744 N.E.2d 622, 632 (2001). Despite the employer's immunity, however, a supervisor may be personally liable if she tortiously interferes with a subordinate's employment relationship. *Steranko v. Inforex, Inc.,* 5 Mass. App. Ct. 253, 362 N.E.2d 222, 235 (1977).

Massachusetts treats proof of actual malice as a proxy for proof that a supervisor was not acting on the employer's behalf and deems such proof sufficient to overcome the qualified privilege. *See Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21, 24 (1981). Such an inference requires an affirmative showing that the actions taken by the supervisor were not derived from a desire to advance the employer's legitimate business interests. *Boothby v. Texon, Inc.,* 414 Mass. 468, 608 N.E.2d 1028, 1040 (1993); *Alba,* 690 N.E.2d at 1243.

Certain situations lend themselves to proof of malice. Pertinently, the SJC has held that the elements underlying a claim for unlawful discrimination may be used to demonstrate malice in the context of a tortious interference claim. *See Comey,* 438 N.E.2d at 817.

Based upon the reasoning of *Comey*, the Court in *Zimmerman v. Direct Fed. Credit Union* found, "We think it follows logically that the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor in a loss-of-employment case. Although not a straightforward "single employer" situation, *Draghetti v. Chmielewski,* 416 Mass. 808, 626 N.E.2d 862, 868–69 (1994), seems to establish the validity of this proposition as a matter of Massachusetts jurisprudence. *Zimmerman v. Direct Fed. Credit Union*, No. CIV.A. 97-12610-RBC, 2000 WL 46006, at *4 (D. Mass. Jan. 7, 2000).

As detailed above, Defendant LeBlanc took numerous measures to threaten the Plaintiff with loss of employment, requiring additional documentation for her pre-approved FMLA time, and restrict her schedule. Perhaps the most telling example occurred when members of the Westminster Police Department began to donate their personal time to the Plaintiff to help allow her time off to take care of her daughter and attend medical appointments. Id at ¶87. Defendant LeBlanc intentionally never provided Plaintiff with an accumulation of the time donated by her fellow officers. Id at ¶88. Defendant Leblanc told his administrative assistant, that he was not going to tell Plaintiff about the donated time by fellow officers because LeBlanc felt Plaintiff was "selfish" for having a GoFundMe me account in her daughter's name that a Grafton Police supervisor organized. Id at ¶89. This GoFundMe account was not created by the Plaintiff or her family members.

Defendant LeBlanc's longstanding pattern of animus, documented in the report authored by Regina Ryan, reflects his personal animus toward the Plaintiff, all of which was predicated upon her pregnancies or her use of FMLA time to care for a seriously ill child. He consistently and successfully interfered with the Plaintiff's employment and caused harm as outlined above and as stated in the Plaintiff's complaint. Accordingly, the Plaintiff's count under intentional interference with an advantageous relationship is not appropriate for dismissal.

    **2. The Plaintiff Has Sufficiently Pled a Viable FMLA Claim.**

**A.** *The Applicable Law*

The FMLA contains two distinct types of provisions: those establishing substantive rights and those providing protection for the exercise of those rights. *Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 330 (1st Cir. 2005) (citing *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159-60 (1st Cir. 1998)). "The first... 'set[s] substantive floors' for

conduct by employers, and creat[es] 'entitlements' for employees." *Colburn,* 429 F.3d at 330 (*quoting Hodgens,* 144 F.3d at 159). The substantive provisions entitle eligible employees, inter alia, to "a total of 12 workweeks of leave" for "a serious health condition that makes the employee unable to perform the functions of [his] position." 29 U.S.C. § 2612(a)(1)(D).

The FMLA also provides protection in the event an employee is discriminated against for exercising the aforementioned rights. *See* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220. In particular, "[a]n employer is prohibited from discriminating against employees [...] who have used FMLA leave." 29 C.F.R. § 825.220(c). Nor may employers "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *Id.* "An employer who flouts these rules can be held liable for compensatory damages and, unless the violation occurred in good faith, additional liquidated damages. [...] Appropriate equitable relief, such as reinstatement, also may be available." *Navarro v. Pfizer Corp.,* 261 F.3d 90, 95 (1st Cir. 2001) (internal citations omitted).

To succeed on a retaliation claim an employee must demonstrate that her employer intentionally discriminated against her in the form of an adverse employment action for having exercised an FMLA right. *King,* 166 F.3d at 891. In other words, an employee bringing a retaliation claim faces the increased burden of showing that her employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id.*

An FMLA retaliation claim involves the familiar three-part burden-shifting framework. *See Esler v. Sylvia-Reardon,* 473 Mass. 775, 780 n.7 (2016), *citing Colburn v. Parker Hannifin/Nichols Portland Div.,* 429 F.3d 325, 335-336 (1st Cir. 2005). First, the Plaintiff must establish a prima facie claim by demonstrating that: (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there

is a causal connection between the protected activity and the adverse employment action. See *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998). The *prima facie* burden is "quite easy to meet." *Id.* at 165.

Once the prima facie burden is met, then the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse action. *Id.* at 160, 166. If that showing is made, the burden shifts back to the employee to demonstrate, to the "level of trial worthiness," that the reason given by the employer was in fact a pretext. *Id.*

**B.** *The Plaintiff Has Established a Prima Facie Case of FMLA Retaliation Against The Defendant.*

The evidence establishes all elements of a *prima facie* FMLA retaliation claim. The Plaintiff availed herself of a protected right by requesting on multiple occasions the use of FMLA time to care for her children. Once she did so, she suffered adverse employment actions in the form of being overtly threatened with job loss, not being allowed to bid on her preferred rotation, losing Christmas holiday time off, having responsibilities taken away, being told to relocate her locker room area, and being required to provide extra FMLA documentation. Defendant LeBlanc's retaliation against the Plaintiff for exercising her FMLA rights was resoundingly identified by Regina Ryan in her investigative findings.[1] Her report outlined the animus directed toward the Plaintiff from Defendant LeBlanc, as further discussed below.

---

[1] "In short, I find that Chief LeBlanc made discriminatory remarks about pregnancy, and this has created an uncomfortable work environment for Sgt. Nelson and Ms. Fay. Further, I find that Chief LeBlanc retaliated against Sgt. Nelson for utilizing pregnancy leave and/or FMLA." "With respect to pregnancy, which is expressly included as a protected class in the Town's policies, Chief LeBlanc has made offensive comments. Sgt. Nelson and Ms. Fay complain that Chief LeBlanc remarked that former officer Holly Doyle should stop "popping out kids" because she could not manage the children she has." "I also credit Ms. Fay's statement that Chief LeBlanc said, "I don't know how [Sgt. Nelson] is going to be a sergeant and have all these kids," and two kids is all you can manage." "I do not credit Chief LeBlanc's denials of these claims." Id at ¶113.

Adverse actions encompass "employer actions that would have been materially adverse to a reasonable employee" and "must be harmful to the point that they could well dissuade a reasonable worker from" engaging in protected activity. Kleya v. Karl Storz Endovision, Inc., 385 F. Supp. 3d 99, 106 (D. Mass. 2019) (citing Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006))

A review of the allegations presented in the Plaintiff's Complaint reveals a systematic effort by Defendant LeBlanc to undermine and retaliate against the Plaintiff for her exercise of her FMLA rights.  For example, on several occasions Defendant LeBlanc threatened the Plaintiff by insinuating her employment with the Town was in jeopardy because she might exhaust both her FMLA and benefit time.  Defendant LeBlanc's repeated threats of job loss clearly fall under the category of adverse actions which could well dissuade an employee from exercising their rights. These threats came on the heels of Defendant LeBlanc purposefully and willfully withholding the benefit time donated by Department employees.

Defendant Leblanc also threatened to impose additional requirements on the Plaintiff's FMLA use. He stated the Plaintiff would be required to provide extra documentation from a doctor if she were to miss a forced overtime due to her use of FMLA for the treatment of her daughter. This imposition was unique to the Plaintiff and specifically designed to punish the Plaintiff.

Defendant Leblanc also retaliated by advising the Union that the Plaintiff was not allowed to bid on her group rotation in the future. This came after December 10, 2021, when the Plaintiff was moved off group rotation with no prior notification. When she asked the Defendant about being moved from her group, the Defendant repeatedly told the Plaintiff, "The world does not revolve around you, Amy."

As noted by Regina Ryan, "this change caused Sgt. Nelson to lose her scheduled days off for Christmas and Christmas Eve. Chief LeBlanc's claim that he was not aware that the change to the group rotation stripped Sgt. Nelson of having the Christmas holidays off, and his insistence that this change is necessary because there are now three sergeants, is not credible. In fact, both the timing of the change in practice, days after she requested time off to care for her sick daughter, and the direct impact it had on her holiday schedule, cannot be understated."" Id at ¶113.

It's also worth noting the well-established rule is that "temporal proximity alone can suffice to meet the relatively light burden of establishing a prima case of retaliation." *Collazo v. Bristol-Myers Squibb Mfg.,* 617 F.3d 39, 49 (1st Cir. 2010). Here, the evidence is that the Defendant's actions outlined above all coincided with the Plaintiff's use of FMLA, which clearly satisfies that burden. *See Surprise v. Innovation Grp., Inc.,* 925 F. Supp. 2d 134, 147 (D. Mass. 2013).

### 3. The Plaintiff Has Sufficiently Pled A Violation Of The MCRA Against Defendant LeBlanc.

A. *The Defendant's Threats Of Job Loss And Infringement Of Plaintiff's FMLA Rights And Right To Continued Employment Violates The MCRA.*

To establish a claim under the MCRA, a plaintiff must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats, intimidation or coercion." *See* M.G.L. C.12 § 11(I), (H); Swanset Dev. Corp. v. City of Taunton, 423 Mass. 390, 395 (1996);. Plaintiff has clearly pled acts which amount to textbook intimidation, threats, and coercion.

1) Threats, Intimidation, and Coercion Have Been Sufficiently Pled.

The coercion element has been defined as "the application to another of such force, *either physical or moral*, as to constrain him to do against his will something he would not otherwise have done." <u>Planned Parenthood League of Massachusetts, Inc. v. Blake</u>, 417 Mass. 467,474 (1994). The standard to be applied is whether a reasonable person would be threatened, intimidated, or coerced by the defendant's actions. Id. at 474-75.

Here, the Plaintiff was coerced and threatened by the Defendant with potential job loss. Defendant LeBlanc responded to Sgt. Nelson that if she ran out of time off, she would be terminated and would have to resign from the WPD. This was done to coerce and intimidate the Plaintiff into not exercising her rights under the FMLA, and caused her great concern about the viability of her employment security.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant's motion to dismiss.

> Respectfully submitted,
> For the Plaintiff, Amy Nelson,
> By her attorney,

Dated: 03/08/2024   */s/ Timothy M. Burke*

> Timothy M. Burke, BBO #065720
> Law Offices of Timothy M. Burke
> 117 Kendrick Street, Suite 300
> Needham, MA 02494
> (781) 455-0707
> tburke@timburkelaw.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this date. Email copies will be sent to those listed as non-participants on the ECF system.


Dated: 03/08/2024                          */s/ Timothy M. Burke*